### IN THE UNITED STATES DISTRICT COURT FOR
### THE SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

| | | |
|---|---|---|
| **COMPREHENSIVE** | § | |
| **INVESTMENT SERVICES, INC.** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs** | § | **CASE NO._____** |
| | § | |
| **DANIEL H. MUDD, ROBERT J. LEVIN,** | § | |
| **STEPHEN M. SWAD,** | § | |
| **STEPHEN B. ASHLEY, MERRILL** | § | |
| **LYNCH, PIERCE, FENNER &** | § | |
| **SMITH, INC., CITIGROUP** | § | |
| **GLOBAL MARKETS, INC., MORGAN** | § | |
| **STANLEY & CO. INC., UBS** | § | |
| **SECURITIES, LLC, and WACHOVIA** | § | |
| **CAPITAL MARKETS, LLC** | § | |
| | § | |
| **Defendants** | § | **JURY TRIAL DEMANDED** |

### COMPLAINT

## TABLE OF CONTENTS

I.     Parties ...................................................................................................4

       A.     Plaintiff ....................................................................................4

       B.     Officer Defendants..................................................................4

       C.     Underwriter Defendants..........................................................5

II.    Jurisdiction and Venue.......................................................................6

III.   Facts .....................................................................................................7

       A.     The History of Fannie Mae .....................................................7

       B.     The Growing Subprime Market ...............................................8

              1.     The Mortgage Market ....................................................8

              2.     Classification of Mortgage Loans.................................9

                     a.     Prime Mortgage Loans.......................................10

                     b.     Subprime Mortgage Loans..................................10

                     c.     Alt-A Mortgage Loans .......................................11

       C.     Fannie Mae's Exposure to Risky Mortgage............................11

              1.     Fannie Mae's Reported Subprime Exposure .................11

              2.     Fannie Mae's Undisclosed Subprime Exposure .........15

       D.     Fannie Mae's Write-Downs.....................................................17

              1.     Fannie Mae's Failure to Properly Mark Down Assets.............17

              2.     Fannie Mae's Failure to Account for Guaranty Obligations ....18

       E.     Fannie Mae's Capital Base .....................................................19

              1.     Deferred Tax Assets and FAS 109..............................19

              2.     Fannie Mae's Use of Deferred Tax Assets .................20

              3.     Fannie Mae's Capital Requirements............................23

        4.      Fannie Mae's Overstated Capital Base ....................................................24

        5.      The Reality of Fannie Mae's Financial Position........................................34

    F.     Risk Management ...........................................................................................37

        1.      Fannie Mae's Risk .....................................................................................37

        2.      Fannie Mae's Representations Regarding Risk Controls ...........................39

    G.     Fannie Mae's Preferred Series T......................................................................43

IV.    Scienter              .....................................................................................................45

    A.     Defendant Mudd ...............................................................................................47

    B.     Defendant Levin................................................................................................48

    C.     Defendant Swad ................................................................................................49

    D.     Defendant Ashley..............................................................................................50

V.     Loss Causation        .....................................................................................................50

VI.    Causes of Action      .....................................................................................................51

    A.     Violation of Section 10(B) of the Exchange Act .............................................51

    B.     Violation of Section 20(A) of the Exchange Act .............................................53

    C.     Violation of Section 12(A)(2) of the Securities Act ........................................54

    D.     Violation of § 27.01 of the Texas Business and Commerce Code ...................55

    E.     Violation of § 27.01(d) of the Texas Business and Commerce Code................57

    F.     Common Law Fraud ..........................................................................................58

    G.     Negligent Misrepresentation.............................................................................58

VII.    Prayer              .....................................................................................................59

## COMPLAINT

Plaintiff, Comprehensive Investment Services, Inc. ("CIS") files this Complaint against Daniel H. Mudd, Robert J. Levin, Stephen M. Swad, Stephen B. Ashley, Merrill Lynch, Pierce, Fenner & Smith Inc., Citigroup Global Markets Inc., Morgan Stanley & Co. Inc., UBS Securities LLC and Wachovia Capital Markets LLC.:

## I. PARTIES

**A.      Plaintiff**

1.        Comprehensive Investment Services, Inc. ("CIS") is a Nevada corporation with its principal place of business in League City, Texas.   CIS is a wholly owned subsidiary of American National Insurance Company.

**B.      Officer Defendants**

2.        Defendant Daniel H. Mudd ("Mudd") was Federal National Mortgage Association's ("Fannie Mae") President and CEO from June 2005 to September 2008. Defendant Mudd was also Fannie Mae's Vice Chairman of the Board from February 2000 to June 2005, Interim CEO from December 2004 to June 2005 and Chief Operating Officer ("COO") from February 2000 to December 2004.

3.        Defendant Robert J. Levin ("Levin") was Fannie Mae's Executive Vice President and Chief Business Officer from November 2005 to September 2008.  Defendant Levin was Fannie Mae's Interim Chief Financial Officer ("CFO") from December 2004 to January 2006, Executive Vice President of Housing and Community Development from June 1998 to December 2004 and Executive Vice President-Marketing from June 1990 to June 1998.

4

4.       Defendant Stephen M. Swad ("Swad") was Fannie Mae's Executive Vice President from May 2007 to September 2008.  Defendant Swad was also Fannie Mae's CFO from August 2007 to September 2008.

5.       Defendant Stephen B. Ashley ("Ashley") was Fannie Mae's Chairman of the Board from December 2004 to September 2008 and served a director from May 1995 until September 2008.  Defendant Ashley was a member of Fannie Mae's Housing and Community Finance Committee and Risk Policy and Capital Committee since 2007.

**C.       Underwriter Defendants**

6.       Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), incorporated in Delaware, is a financial services institution that provides commercial and investment banking services to corporate entities.  Merrill Lynch underwrote shares of Fannie Mae Preferred Series T Shares.

7.       Defendant Citigroup Global Markets, Inc. ("CGMI"), incorporated in New York, is a subsidiary of Citigroup Inc., a financial services institution that provides commercial and investment banking services to corporate entities.  CGMI underwrote shares of Fannie Mae Preferred Series T Shares.

8.       Defendant Morgan Stanley & Co., Inc. ("Morgan Stanley"), incorporated in Delaware, is a financial services institution that provides commercial and investment banking services to corporate entities.  Morgan Stanley underwrote shares of Fannie Mae Preferred Series T.

9.       Defendant UBS Securities, LLC ("UBS"), incorporated in Delaware, is a financial services institution that provides commercial and investment banking services to corporate entities. UBS underwrote shares of Fannie Mae Preferred Series T.

10.     Defendant Wachovia Capital Markets, LLC ("Wachovia"), incorporated in Delaware, is a financial services institution that provides commercial and investment banking services to corporate entities.  Wachovia underwrote shares of Fannie Mae Preferred Series T.

## II.  <u>JURISDICTION AND VENUE</u>

11.     This action arises under Sections 10(b), 12 and 20 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder, and Section 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77(a)(2).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332, Section 27 of the Exchange Act, 15 U.S.C. § 78aa and Section 22 of the Securities Act, 15 U.S.C. §77v.  This action arises under the laws of the United States and involves federal questions.  The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).

13.     The Court has personal jurisdiction over all Defendants in connection with the acts alleged in this complaint.  Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.  All Defendants are residents of the United States and have availed themselves of the Federal Securities Laws and the laws of the states in which they operate.  The Court has jurisdiction over the parties and subject matter of this cause, and has jurisdiction to grant all relief requested by Plaintiff.

### III. FACTS

14.     Fannie Mae is, according to the Offering Circular pursuant to which Plaintiff purchased Preferred Stock, Series T shares (the "Offering Circular"), a "federally chartered and stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act, 12 U.S.C. § 1716 et seq."  Fannie Mae was established in 1938 to provide stability and liquidity to the mortgage market.  It became a stockholder-owned and privately managed corporation in 1968.  Fannie Mae operates in the secondary market securitizing mortgage loans into mortgage-backed securities and other mortgage-related securities. Fannie Mae also purchases mortgage loans for its mortgage portfolio.

15.     This suit arises out of Defendants' wrongful acts and omissions with respect to actions taken by Fannie Mae and in aiding and abetting Fannie Mae to defraud Plaintiff.

**A.      The History of Fannie Mae**

16.     Fannie Mae, a government-sponsored enterprise ("GSE") chartered by Congress, is a shareholder-owned mortgage-investment company that purchases loans from commercial banks and lenders and then either keeps the mortgages or sells them in investment products known as mortgage-backed securities.  These transactions give the primary lenders additional funds to make further loans to other home-buyers.

17.     The government established Fannie Mae in order to expand the flow of mortgage funds and to increase home ownership levels.  In 1968, Fannie Mae was re-chartered by Congress as a shareholder-owned company, funded solely with private capital.

18.     According to Fannie Mae's charter, it was established to provide stability in the secondary market for residential mortgages and to respond appropriately to the private capital market.  Part of its purpose was to manage and liquidate federally owned mortgage portfolios in

an orderly manner, with minimum adverse effects upon the residential mortgage market and minimal loss to the federal government.

19.      On September 7, 2008, Congress, after reviewing Fannie Mae's financials, determined that Fannie Mae was no longer in a position to accomplish the task for which it was created and placed the company in conservatorship, to be run by the Federal Housing Finance Agency.[1] Fannie Mae's top executives were ousted and replaced.[2]

**B.      The Growing Subprime Market**

    **1.      The Mortgage Market**

20.      In the 1990s and early 2000s the United States real estate market boomed due to rising home values and low interest rates on mortgages. As a result, more Americans sought financing for homeownership.  Lenders competed for potential borrowers by lowering credit standards and offering alternative mortgage products to less qualified individuals.

21.      Alternative loan products included:

    (a)      No-documentation and low-documentation loans:  Known in the industry as "liar loans," these loans involve practice of requiring little or no documentation from the borrower.

    (b)      Piggy-back loans:  These combine a mortgage with a home-equity loan or line of credit, allowing borrowers to finance more than 80 percent of the home's value without paying for private mortgage insurance.

    (c)      Interest-only mortgages:  These allow borrowers to pay only interest in the loan's early years, which keep payments low for a time, but require

---

[1] Mark Jickling, *Fannie Mae and Freddie Mac in Conservatorship*, Congressional Research Service, The Library of Congress, September 15, 2008.
[2] *Id.*

that the deferred payment of principal be made in the future through increased monthly or balloon payments.

(d)     Option adjustable-mortgages:  These loans, called hybrid ARMs,[3] were marketed with promotional or "teaser" rates during an introductory period that later ballooned to much higher rates once the introductory period has ended.

22.     In addition to the increased interest in homeownership, many financial firms began "securitizing" mortgages by buying them from the original lender, pooling them with other mortgages, and selling interests in the underlying cash flow to investors.  This practice freed up capital for the original lender so that it could approve more and more loans.

23.     As was fully known to all Defendants, beginning in 2004, the real estate and mortgage markets experienced a tremendous downturn, initiated and fueled by falling home values, rising interest rates and the proliferation of high-risk mortgage loans.  As a result, the market experienced a surge in mortgage defaults, causing increased exposure to losses to financial institutions, like Fannie Mae, that were heavily invested in mortgage-backed securities.

**2.      Classification of Mortgage Loans**

24.     There are various types of mortgage loan products.  Mortgage loans differ based on factors such as loan rate, payment options, maturity date and amortization of principal. When applying for a mortgage loan, borrowers are generally placed into three major categories: prime, subprime and Alt-A.

---

[3] "ARM" refers to an "Adjustable Rate Mortgage".

### a.    Prime Mortgage Loans

25.    Prime mortgage loans are of high quality.  Lenders use the Fair Isaac & Company ("FICO") credit scoring system (in which a borrower is assigned a FICO score ranging from 300 to 850) to determine which borrowers are qualified for prime loans. Generally, a borrower with a FICO score of greater than 620 is considered eligible for a prime loan.  However, past payment history, bankruptcy, foreclosure, and loan-to-value ratio are also considered.

### b.    Subprime Mortgage Loans

26.    Subprime mortgage loans are issued to borrowers with low or deficient credit scores who do not qualify for a loan under conventional credit criteria.  Subprime loans are riskier than prime loans and subprime borrowers pay higher interest rates supposedly proportionate to the higher credit risk.

27.    Subprime loans began to proliferate due to a confluence of factors including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.[4]

28.    In 2006, subprime lending amounted to approximately 20 percent of the nation's mortgage lending and approximately 17 percent of homes were purchased subject to subprime mortgages.[5]

---

[4] Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., Testimony Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate:  *Federal Deposit Insurance Corporation on Mortgage Market Turmoil:  Causes and Consequences*, Mar. 22, 2007.
[5] *Id.*

### c.      Alt-A Mortgage Loans

29.      Alt-A mortgage loans fall between prime and subprime loans. Alt-A borrowers generally have a clean credit history but may have some qualities that increase the risk to the lender, such as higher loan-to-value and debt-to-income ratios or inadequate documentation of income. Typically, an Alt-A borrower is self-employed, has good cash flow, a higher FICO score and a good credit history but can not validate his income.

30.      Although Alt-A loans were intended to be less risky than subprime loans, Alt-A products were actively marketed to subprime borrowers so that any practical difference between Alt-A and subprime loans was virtually eliminated.  Alt-A loans are often referred to as "liar loans" because no documentation of income was required.

## C.      Fannie Mae's Exposure to Risky Mortgages

### 1.      Fannie Mae's Reported Subprime Exposure

31.      As other lenders began investing in riskier mortgages, Fannie Mae decided to abandon sound practices and follow its competitors so that it could maintain its status as a market leader.  Fannie Mae was faced with the decision to "(1) Stay the course; or (2) Meet the market where the market is."[6] Fannie Mae, knowing of the risks involved with investing in subprime and Alt-A loans, joined its competitors and became heavily invested in the real estate market.

32.      In 2006, Fannie Mae began to expand its involvement in the subprime mortgage market and throughout 2006 and 2007 became a leader in the mortgage backed securities market that later sustained substantial losses.

---

[6] Confidential Fannie Mae Presentation, *Single Family Guaranty Business Facing Strategic Crossroads*, June 27, 2005.

33.      In January 2007, Defendant Mudd sent a confidential memo to Fannie Mae's Board, touting the company's expansion into the subprime market.[7]

34.      Just one month later in February 2007, Fannie Mae, while recognizing the poor performance of subprime loans, predicted that their performance would improve in 2007.  In an effort to increase its market share, Fannie Mae outlined plans to increase its involvement in the subprime mortgage market.[8]

35.      Fannie Mae made plans to specifically target both Alt-A and subprime mortgage loans, with a stated objective to "increase our penetration into subprime."[9]

36.      As the subprime and Alt-A market experienced a downturn, Fannie Mae ignored the signs of a failing real estate market and continued to increase its investment in these risky loans.

37.      On April 17, 2007, Fannie Mae announced to the House Financial Services Committee that it would increase its involvement in the subprime mortgage market by offering expanded programs aimed at borrowers with poor credit histories.[10]  Under the program, Fannie Mae would ease its credit requirements and buy 40-year loans as well as 30-year loans in the secondary market.[11]

38.      On September 12, 2007, Fannie Mae requested a further relaxation of restrictions on its ability to expand its mortgage-related portfolio.[12]

39.      One week later, in response to Fannie Mae's request to increase its stakes in the subprime mortgage sector by buying billions of dollars in subprime mortgages and refinanced

---

[7] David S. Hilzenrath, *Fannie's Perilous Pursuit of Subprime Loans*, Washington Post (August 19, 2008), at D1.
[8] *Id.*
[9] *Id.*
[10] *See Fannie Mae, Freddie Mac Look at New Loans*, MSNBC.com (April 17, 2007).
[11] *Id.*
[12] *See* Pete Kasperowicz, *Fannie Mae Renews Pitch to Add Liquidity to Market by Lifting Caps*, Forbes.com (September 12, 2007).

loans for borrowers with lower credit scores, the Office of Federal Housing Enterprise Oversight ("OFHEO")[13] slightly increased the cap on Fannie Mae's portfolio to a 2 percent annual growth rate with no more than a 0.5 percent growth rate per quarter.[14]

40.     As of September 30, 2007, Fannie Mae's mortgage credit book of business, which included mortgage-backed securities ("Fannie Mae MBS") held by third parties, credit enhancements provided on mortgage assets and mortgage assets held in its own investment portfolio, was $2.8 trillion, approximately 23 percent of the total outstanding United States' residential mortgage debt.

41.     By the end of 2007, Fannie Mae had guaranteed or invested $717 billion in subprime and Alt-A loans, up from almost no subprime or Alt-A loans in 2000.

42.     As a consequence, the surge in mortgage defaults resulted in a huge increase in exposure to losses for Fannie Mae, as the company bore the credit risk and interest-rate risk for the loans it purchased and held.

43.     Despite numerous warning signs of the mortgage meltdown, in October 2007, Fannie Mae again requested to have the cap on its mortgage-related portfolio loosened to permit it to increase the size of its mortgage-related portfolio.  At the time, OFHEO Director James Lockhart expressed concern regarding Fannie Mae's attempt to enlarge its portfolio, stating that should the company take on too much risk, it "certainly could affect their financial results."[15]

---

[13] *See* Neil Adler, *Lifting Portfolio Cap Could Hurt Fannie, Freddie*, Washington Business Journal (October 5, 2007).
[14] OFHEO is an agency within the Department of Housing and Urban Development charged with ensuring the capital adequacy and financial safety and soundness of Fannie Mae.
[15] *See* Neil Adler, *Lifting Portfolio Cap Could Hurt Fannie, Freddie*, Washington Business Journal (October 5, 2007).

44.     In response, Fannie Mae stated that "it would be inappropriate to speculate on how increasing their portfolios would affect the company's financial results" and indicated that it would like to raise the cap by at least 10 percent.[16]

45.     Rather than focus on its exposure to losses and capitalization problems, Fannie Mae issued a 2007 Q1-Q3 10-Q Investor Summary which stated it would seek to have the restrictions on its mortgage-related portfolio lifted, claiming that it was better positioned for relief from its capital surplus requirement and portfolio cap.

46.     Fannie Mae continued to increase its risk to losses when on May 16, 2008, it announced that it was lowering, on a nationwide basis, the amount of required down payments on mortgages it purchased, meaning that it would purchase loans with higher loan-to-value ratios.[17]

47.     Fannie Mae and Federal Home Loan Mortgage Corporations ("Freddie Mac") together ended up with about half of the $3 trillion world-wide exposure to subprime and Alt-A losses.[18]   Furthermore, Fannie Mae stayed in the market long after the mid-2006 downturn when other lenders were exiting.   Originators of subprime and Alt-A mortgages knew that Fannie Mae would buy their poorly underwritten instruments.   Indeed, Fannie Mae legitimized lenders' (like IndyMac Federal Bank, FSB ("IndyMac") and Countrywide Financial Corp. ("Countrywide")) unsound underwriting practices and gave assurance that there was a source of demand for these products.[19]

---

[16] *Id.*
[17] News Release from Fannie Mae: Fannie Mae Announces Single National Down Payment Policy; Replaces Policy Regarding Markets Where Home Prices are Declining, (May 16, 2008).
[18] Statement of Charles W. Calomiris, United States House of Representatives Committee on Oversight and Government reform, December 9, 2008.
[19] *Id.*

48.     By July 2008, Fannie Mae had an extremely high proportion of Alt-A and subprime mortgages both on its books and in the MBS portfolios it guaranteed. Of Fannie Mae's $2.2 trillion in loans and guarantees, $396 billion, or a whopping 18%, were Alt-A or subprime.[20]

49.     Edward Pinto ("Pinto"), Fannie Mae's Chief Credit Officer from 1987-1989, in testimony before the United States House of Representatives Committee on Oversight and Government Reform on December 9, 2008, stated that Fannie Mae and Freddie Mac's subprime and Alt-A holdings comprised over a third of their respective risk portfolios and those loans were experiencing a default rate eight times higher that the GSEs' traditional quality loans. Together, the companies held 34 percent of all outstanding subprime loans and 60 percent of all outstanding Alt-A loans.  Fannie Mae alone held approximately 20 percent of all outstanding subprime loans and 30 percent of all outstanding Alt-A loans.  [21]

50.     Although Alt-A loans are generally not classified as subprime because the FICO score of the borrower is generally above 660, these loans defaulted at rates approaching those of subprime loans.

**2.     Fannie Mae's Undisclosed Subprime Exposure**

51.     Although Fannie Mae disclosed some of its exposure to the subprime and Alt-A market, the extent of Fannie Mae's exposure to these failing markets was concealed from investors.

---

[20] Joe Specht, *Fannie Mae – or May Not*, SeekingAlpha.com (July 11, 2008).
[21] *Id*.

52.     For example, the loans purchased or securitized by Fannie Mae were included in the company's prime loan databases even though 34 percent of these loans were properly classified as subprime, Alt-A or other non-prime loans.[22]

53.     Pinto stated in his testimony to Congress:

For historical reasons, these loans are also carried in databases as prime loans when they were purchased by Fannie and Freddie, which conveniently allowed them to deny that they were active in the subprime market.  This created tremendous disclosure problems for the industry, since a massive portion of subprime, Alt-A mortgages and other non-prime lending has long been hidden behind Fannie and Freddie's "prime" façade.  Accordingly, there are many more subprime and Alt-A mortgages outstanding today than many people suppose, because half of all these loans are held or securitized by Fannie and Freddie and yet are carried in many databases as prime loans.

54.     According to Pinto's testimony, Fannie Mae reported 0.24 million subprime loans, but maintained an additional 3.05 million loans it listed as prime despite the fact that the borrowers had FICO scores of less than 660.

55.     Charles Calomiris, the Henry Kaufman Professor of Financial Institutions at Columbia Business School, in testimony before the United States House of Representatives Committee on Oversight and Government Reform on December 9, 2008, stated that Fannie Mae did not disclose the extent of its subprime and Alt-A exposure and noted that most market observers had no idea of the extent of Fannie Mae's exposures until recently.

56.     Moreover, on July 9, 2008, *Bloomberg* reported that, "Credit-default swaps tied to $1.45 trillion of debt sold by the two biggest U.S. mortgage-finance companies are trading at levels that imply the bonds should be rated A2 by Moody's Investors Service."[23]  Derivative traders began to overlook the government's implied guarantee of Fannie Mae's debt as credit

---

[22] Testimony of Edward J. Pinto, Oversight Committee, December 9, 2008.
[23] *See* Shannon D. Harrington and Dawn Kopecki, Fannie, Freddie Downgraded by Derivatives Traders, Bloomberg.com (July 9, 2008).

losses grew and concern rose that Fannie Mae would not have enough capital to weather the housing slump.[24]

57.     Fannie Mae's investors, including the Plaintiff, were unaware of the company's actual exposure to the Alt-A and subprime market.

**D.     Fannie Mae's Write-Downs**

**1.     Fannie Mae's Failure to Properly Mark Down Assets**

58.     Fannie Mae did not adequately write-down its subprime and Alt-A assets.  By the end of 2007, it was holding about $74 billion Alt-A and subprime loans in its portfolio, but had written them down by only 4.6 billion (6%), a far lower rate than other financial institutions were writing down in similar loan portfolios.  For the first six months of 2008, Fannie Mae recorded only an additional $714 million as a permanent write-down despite the fact that a good portion of Fannie Mae's portfolio was severely delinquent.

59.     Fannie Mae stated in the Offering Circular that its "largest lender customer, Countrywide Financial Corporation and its affiliates, accounted for approximately 28 percent of [its] single-family business volume during 2007."  By the end of 2007, Countrywide was already in dire financial straits as a result of its improper underwriting practices, and was notorious for its unsound practices in generating these loans.  This was an impossible to ignore red flag to Fannie Mae that more aggressive write-downs for these loans were absolutely necessary.

60.     As the real estate market declined, Fannie Mae held a substantial number of subprime and Alt-A loans.  However, as market indices revealed the decline in market prices for these loans, Fannie Mae failed to adequately write down its assets.

**2.     Fannie Mae's Failure to Account for Guaranty Obligations**

---

[24] *Id.*

61.     In accordance with Generally Accepted Accounting Principles ("GAAP") principles, a company is required to establish an allowance for guaranty obligations (i.e. a reserve for the estimated amount of losses related to those guarantees).  Statement of Financial Accounting Standards ("SFAS") No. 5 states:

> An estimated loss from a loss contingency…shall be accrued by a charge to income if *both* of the following conditions are met:

> a.     Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

> b.     The amount of loss can be reasonably estimated.

62.     Fannie Mae generated revenue by absorbing credit risk of mortgage loans and mortgage-related securities in exchange for a guaranty fee.  The guarantees exposed Fannie Mae to credit losses on mortgages and mortgage-related securities.  As a result, Fannie Mae set up a guaranty reserve to cover the expected amount of losses associated with its guaranty obligations.  As of June 30, 2008, Fannie Mae's guaranty book of business stood at $2.8 trillion.  On a "fair value" balance sheet, which involves valuing every asset and liability at current market value, Fannie Mae's guaranty obligations were valued at $59.8 million. Nonetheless, Fannie Mae's obligations for the period were recorded for book purposes at $16.4 million despite the fact that a large amount of the guarantees were tied to risky subprime or Alt-A loans.  Defendants failed to properly account for Fannie Mae's guaranty obligations as doing so would have negatively affected Fannie Mae's reported net worth.

E.      **Fannie Mae's Capital Base**

1.      **Deferred Tax Assets and FAS 109**

63.     Fannie Mae's capital base consisted in large part of deferred tax assets which could only be recognized if the company posted profits in future quarters.

64.     Under Financial Accounting Standard No. 109 ("FAS 109"), a deferred tax asset is recognized for temporary differences that will result in deductible amounts in future years and for carry-forwards.  For example, a temporary difference is created between the reported amount and the tax basis of a liability for estimated expenses if, for tax purposes, those estimated expenses are not deductible until a future year. Settlement of that liability will result in tax deductions in future years, and a deferred tax asset is recognized in the current year for the reduction in taxes payable in future years.

65.     A valuation allowance is recognized if, based on the weight of available evidence, it is ***more likely than not*** that some portion or all of the deferred tax asset will not be realized.[25]

66.     In determining whether to report deferred tax assets, a company has to consider both positive and negative evidence regarding whether it will post profits in the future and generate sufficient future taxable income to be able to use the credits.[26]  Moreover, in making its determination, a company should consider the existence of cumulative losses in recent fiscal years, its operating results history, and adverse unsettled circumstances and forecasted future taxable income.

67.     Deferred tax assets do not have value until a company generates a profit. Although Fannie Mae continued to report losses and the outlook on the future of the real estate

---

[25] *See* FAS 109.
[26] *Id*.at ¶23.

market was dismal, Fannie Mae reported billions in deferred tax assets deceiving the public and its investors into believing its capital base was nearly twice what it was in reality.

       2.      **Fannie Mae's Use of Deferred Tax Assets**

68.      Fannie Mae reported a series of quarterly losses and was highly invested in the failing real estate market, however, the company continued to report increased deferred assets with every quarter.

69.      In the third quarter of 2007, Fannie Mae recorded net losses of $1.52 billion dollars.  Losses increased to $3.6 billion in the fourth quarter.

70.      Fannie Mae continued to recognize substantial losses in 2008.  The company recorded $2.2 billion in losses in the first quarter, $2.3 billion in the second quarter and a shocking $29 billion loss in the third quarter of 2008.

71.      Even though Fannie Mae had not recognized a profit in several quarters and losses continued, Fannie Mae increased its reported deferred tax assets throughout 2007 and 2008.

72.      In the third quarter of 2007, Fannie Mae reported $9.89 billion dollars of deferred tax assets.  In the following quarter, Fannie Mae reported approximately $12.97 billion in deferred tax assets.  Fannie Mae continued to increase its recognition of deferred tax assets throughout 2008 reporting $17.8 billion in the first quarter and $20.6 billion in the second quarter:

| Quarterly Report | Losses (in billions) | Deferred Tax Assets (in billions) |
|---|---|---|
| 10-Q 3rd Quarter 2007 | $1.52 | $9.89 |
| 10-K 4th Quarter 2007 | $3.6 | $12.97 |
| 10-Q 1st Quarter 2008 | $2.2 | $17.8 |
| 10-Q 2nd Quarter 2008 | $2.3 | $20.6 |
| 10-Q 3rd Quarter 2008 | $29.0 | $4.6 |

73.     Fannie Mae inflated its capital base by using deferred tax assets and presented the appearance that the company was financially sound when in fact the company did not have sufficient capital to support its losses.  Without recognizing the deferred tax assets, Fannie Mae would not have met its minimum capital requirements:

| Reported in billions | | | | |
|---|---|---|---|---|
| Date | Statutory Minimum | FHFA[27]/OFHEO Minimum | Core Capital | Capital Without Deferred Tax Assets |
| 09/30/07 | $30.303 | $39.393 | $41.713 | $31.823 |
| 12/31/07 | $31.927 | $41.505 | $45.373 | $32.403 |
| 03/31/08 | $31.335 | $37.602 | $42.676 | $24.876 |
| 06/30/08 | $32.631 | $37.525 | $46.964 | $26.364 |

74.     Without recognizing offsets from deferred tax assets, Fannie Mae would not have met even the statutory minimum capital requirements in the first and second quarter of 2008 and would not have met the mandated surplus requirement established by the OFHEO in the third and fourth quarters of 2007.   For Fannie Mae, not reporting deferred tax assets would have resulted in falling well below its minimum requirements.

75.     Even when Fannie Mae did recognize large profits, the deferred tax assets did not have value because the company also had large numbers of affordable housing tax credits, which offset profits.[28]

---

[27] Federal Housing Finance Agency ("FHFA"), as of July 30, 2008, regulates Fannie Mae, Freddie Mac and other lending institutions.

76.     Fannie Mae continuously touted its capital holdings affirming that it held capital above the minimum requirements while failing to disclose that much of its capital base involved assets which would likely not be realized in the future, particularly given the deteriorating real estate market.

77.     George Victor, a partner at Holtz Rubenstein Reminick, LLP, an accounting firm, stated, "when a company has had a continued loss and doesn't anticipate future profits to offset the deferred-tax assets, it -- shouldn't be on the books."[29]

78.     An article issued on September 14, 2008, in *Financial Week* stated:

> Other companies, especially commercial banks, could also boost their capital with deferred-tax assets and get away with it to a certain extent. But only the banks, or at least big ones, might be able to count on auditors and regulators being as lax on them as they were on Fannie and Freddie, because of the risk to the financial system their failure might pose.

79.     On October 29, 2008, *The New York Times* stated that "deferred tax assets became controversial for Fannie Mae after the company posted a string of surprising quarterly losses, which hamstrung its ability to raise capital to offset losses from rising foreclosures."[30]

80.     As Fannie Mae reassured the public that its capital base was strong enough to withstand the market, Plaintiff invested $15 million in Preferred Series T stocks issued by Fannie Mae.  It was not until after this purchase that the news became public that Fannie Mae did not expect to realize its deferred tax assets and that the capital held by the company was in such dire condition that the government felt compelled to step in.

81.     On September 7, 2008, due to Fannie Mae's financial position, the government placed Fannie Mae into conservatorship.

---

[28] Gretchen Morgenson and Charles Duhigg, *Mortgage Giant Overstated the Size of its Capital Base*, NYTimes.com, (September 6, 2008).
[29] *Financial Week*, "IRS break boosts Fannie, Freddie", September 14, 2008.
[30] *Fannie Mae to Write Down Deferred Tax Assets*, NYTimes.com (October 29, 2008).

82.     A *Bloomberg* report, dated October 29, 2008, entitled "Fannie Mae to Reduce Value of Deferred Tax Assets" stated that the use of deferred-tax assets and other accounting methods by Fannie to inflate their capital was cited by regulators as one of the reasons why the government took control.

83.     Treasury Secretary Henry Paulson, in a statement regarding Fannie Mae and Freddie Mac issued on September 7, 2008, stated:

> Based on what we have learned about these institutions over the last four weeks – including what we learned about their capital requirements – and given the condition of financial markets today, I concluded that it would not have been in the best interest of the taxpayers for Treasury to simply make an equity investment in these enterprises in their current form.

84.     Fannie Mae's government-appointed Chief Executive Officer, Herb Allison, stated that he revalued all of Fannie's assets.[31]  Soon after, Fannie Mae wrote down over $20 billion in deferred assets.

### 3.     Fannie Mae's Capital Requirements

85.     Fannie Mae is required by statute to hold a minimum capital of 2.5 percent of on-balance sheet assets.  This leverage capital requirement is lower than those for Federal Home Loan Banks ("FHLB") or for private financial institutions. [32]

86.     In the wake of Freddie Mac and Fannie Mae's respective accounting scandals between 2001 and 2004, OFHEO imposed on both of the GSEs a 30 percent required capital surcharge above the statutory requirement making the minimum requirement 3.25 percent (1.3 x 2.5 percent).  Even with this increase, the FHLB's minimum capital requirement was 23 percent higher than Fannie Mae's.

---

[31] Bloomberg, *Fannie Mae to Reduce Value of Deferred Tax Assets*, October 29, 2008.
[32] The corresponding requirement for FHLBs is 4 percent--or 60 percent more capital required against the equivalent assets.

87.     Despite the minimum statutory requirement, Fannie Mae is still expected to hold sufficient capital to be able to withstand a decline of housing prices comparable to a severe historical recession.

88.     By statute and regulation, the FHFA's risk-based capital "stress test" is defined as a cash flow stress test that determines the amount of total capital sufficient to maintain positive capital during a 10-year defined stress period.

89.     Thus, the stress test requires Fannie Mae to safely manage its risks or hold additional capital commensurate with its risk exposure

### 4.     Fannie Mae's Overstated Capital Base

90.     Fannie Mae grossly overstated its capital base and misrepresented to the public and its investors that the company was taking a conservative approach to managing capital. Fannie Mae did not have sufficient capital on hand to handle the market conditions, contrary to its representations in SEC filings, public statements and the Offering Circular.   Although Fannie Mae reported that it met its capital requirements, which was well below the requirements of private financial institutions, the company reported billions in deferred tax assets each quarter in order to meet those minimum requirements.   However, Fannie Mae could not recognize the deferred assets in a failing market.

91.     In his testimony to the Oversight Committee, Arnold Kling, a senior economist at Freddie Mac from 1986-1994, stated that Fannie Mae took on more risk than it should have, with less capital than was prudent.

92.     On November 9, 2007, Fannie Mae issued a press release entitled "Fannie Mae Files 2007 Quarterly Reports with the SEC – Company Returns to Current Financial Reporting" wherein Defendant Mudd stated:

During the last year, we vastly reduced our material weaknesses in internal controls, expanded our risk-management functions, reduced our headcount, and cut our operating expenses. The Company *is in solid shape to support the market, and is in better shape to benefit when the market correction ends*.

(Emphasis added)

93.     The report went on to state that "Fannie Mae's core capital in the third quarter was $41.7 billion, $2.3 billion above the level mandated by the OFHEO-directed 30 percent capital surplus requirement."

94.     However, without the use of deferred tax assets, Fannie Mae would not have met its minimum capital requirements.

95.     On a November 9, 2007, conference call, Nandu Narayanan, an analyst from Trident Investment Management posed the question:

Given your equity capital of $40 billion and given that more people are saying that this might be one of the worst housing markets since the Great Depression. Because we've never had a national home price decline since the Great Depression, and given that with $40 billion of capital, you've got something in the order of $3 trillion of risk. You know, what do you see as the prognosis?

96.     Defendant Mudd responded, in part, by saying:

Do we plan for all kinds of scenarios? Yes. Do we plan for scenarios that might be significantly worse than what we are projecting? Yes. Is that what we hold capital against? Yes. Is our total capital more than our risk-based capital? Yes. Is this a time to be conservative from a capital standpoint? Yes, it is. Is this a time to take these issues and these scenarios extremely seriously? Yes. Is this a time to make sure that we are beefing up all of our back-end resources to manage loss mitigation and foreclosures? Yes. Are we doing that? Yes. Do we know what's going to happen? No. That's when I finally have to give you a no answer. But are we prepared for scenarios that are somewhat historical? Yes.

97.     Defendant Mudd represented to investors that Fannie Mae was prepared for a severe crisis. However, Fannie Mae was severely undercapitalized and could not weather a substantial downturn in the market. This forced the government to take control of Fannie Mae to correct its financial position.

98.     Also on the November 9, 2007, conference call, Howard Shapiro, an analyst

from Fox-Pitt Kelton asked:

> Okay, so if you we[re] to have a very large charge of some magnitude, you could
> conceivably be undercapitalized, or your capital ratios would go below the 30%
> OFHEO surcharge; that is conceivable?

99.     Defendant Swad avoided a direct response to Shapiro's question and instead

said:

> I think the way to think about it is, our capital is affected by GAAP earnings.  SOP
> 03-3 is a component of GAAP earnings, as is our 22 basis point G fee revenue and
> growing.  And to look at any one line item I don't think is the appropriate way to
> look at it.  Just to remind you, we have over $2 billion of excess above the
> minimum.

100.    Fannie Mae continuously attempted to reassure the market that it had adequate

capital and downplayed its losses.

101.    On a November 16, 2007, conference call with analysts, Brad Ball, a Citigroup

analyst asked about the capital adequacy of the company.  Defendant Swad stated:

> We disclosed over $41 billion of capital as of September [30, 2007] and over $2
> billion of excess.  And I also want to highlight that we are currently in an
> environment where there are very profitable incremental investments in both of our
> major businesses, on the Single-Family side and on the Capital Market side, where
> we believe we can make investments and earn returns well above our cost of
> capital.

102.    On December 4, 2007, Fannie Mae announced that in an effort to raise

additional capital, it would reduce its dividend by 30 percent and issue $7 billion of preferred

stock in one or more offerings throughout the month.

103.    Fannie Mae stated that the stock sale would provide it with additional funds to

help manage higher risk in the housing and credit markets.  Fannie Mae also announced in its

press release:

> This financing will provide the company with additional capital to conservatively
> manage increased risk in the housing and credit markets, help meet its mission of

26

providing affordability, liquidity and stability, and free up capital to pursue emerging growth opportunities.

104.     On February 27, 2008, Fannie Mae reported its fourth quarter and full year 2007 financial results, reporting a net loss of $2.1 billion, or ($2.63) per diluted share, versus net income of $4.1 billion during 2006.   The company also reported substantial losses from subprime and Alt-A mortgages.   However, Fannie Mae continued to stress that its capital base was strong.

105.     On a conference call on February 27, 2008, regarding Fannie Mae's 2007 results, Defendant Mudd stated:

> The number one priority is capital.   We want to stay long capital.   2007 was a tough year.   2008 will be tough as well.   And 2009 we do not anticipate will be particularly rosy, so through this period, capital remains king and we want to remain long capital…

> The third priority, responding to the crisis.   We're fully cognizant of the fact that responding in crisis is something that we were chartered to do, that we have to marshal capital to play that role, which is providing liquidity and stability and affordability in the markets, including now the jumbo market as well.

106.     Defendant Mudd concluded his remarks commenting:

> So we're not making – we're not under any illusions here.   I think we're being realistic.   This is a tough environment.   We are taking all the necessary steps to manage our way across it to move across that bridge I have talked about.

107.     However, while recognizing the difficulty in the real estate market, Fannie Mae continued to report deferred tax assets as a significant portion of its capital base.

108.     In the February 27, 2008, conference call with investors, the company continued to assure the public that it was taking a conservative approach to managing capital.  Defendant Mudd stated there were no current plans to go back to the market for capital.  "As the market recovers, we will be a prime beneficiary," Defendant Mudd said, "when the housing market finally stabilizes, the company will 'feast' on the mortgages it is currently buying."

109.     On that same conference call Defendant Mudd also stated, "You can see we ended 2007 with $47.4 billion in core capital, that's $13.4 billion above the statutory minimum and $3.9 million above the OFHEO-mandated 30% level."  He went on to state:

> I think that investors should expect us through the period of this turmoil to manage our capital account ***very conservatively***, with respect to dividends and buybacks.  I think we need to be long capital and well, as I said, stay above those regulatory levels whether the requirements are in place or not.

(Emphasis added)

110.     In response to a question regarding Fannie Mae's capital surplus posed by David Hochstim, an analyst from Bear Stearns, Defendant Mudd responded:

> I think there are two things, and I talked about them in my remarks.  One is to be ***conservative in terms of protecting the capital*** that we have, but the other is to be aware that we are trying to build for the future.
>
> *            *            *
>
> So as you can see by doing the math there, ***there's about $13 billion above the statutory requirement***.  The 30% OFHEO requirement was put in place against those uncertainties from the restatement in '01 to '04.  As I noted, I think we worked diligently and in very good cooperation with OFHEO to address all of those 81 remediation items, embodied, certainly in the 10-K, in the clean socks opinion.  And as you know, OFHEO made a statement today and we really welcome and appreciate director Lockhart's comments, which I think lay a path for us to move through the consent order, but through that, ***to continue to manage the capital very conservatively, given the uncertainties in a troubled market.  So we'll conserve capital***.  We will – we will continue those discussions to access the capital that is there above the – above the statutory minimum, and I think us being able to apply that capital to both sides of the equation I talked about, fulfilling our role as a guarantor and insurer and in an environment that's taking losses but at the same time, to be able to provide liquidity to a market that really needs it, you know, is in really everybody's interest right now.  I'm pleased that we are moving that direction.

(Emphasis added)

111.     Additionally, on the February conference call with investors, Defendant Levin, reassured investors saying "[o]ur operating philosophy for capital is to manage it to protect

28

ourselves against market scenarios ***more adverse than we expect***.  It's a conservative approach to managing the capital." (emphasis added.)

112.    On the February 2008 conference call, Peter Niculescu, Executive Vice President of Capital Markets for Fannie Mae stated:

I think we're in a situation where we have ***meaningful capital surplus and we're intending to maintain that meaningful capital surplus through the housing crisis.  However long that lasts***.  And we'll be managing our activities, including our balance sheet in order to maximize returns our investors and maximize our liquid potential given the available capital that we have in the market place now.

(Emphasis added)

113.    Defendant Swad also made statements in the same February 2008 conference call regarding Fannie Mae's capital base.  He stated:

[W]e ended 2007 with $45.4 billion in [core] capital, that's $13.4 billion above the statutory minimum and $3.9 [billion] above the OFHEO-mandated 30% level.  In addition, we have got approximately $50 billion of very short-term maturing assets, mainly bank deposits within our liquid investment portfolio against which we hold $1.6 billion in capital.  We can reduce our capital requirement and thereby increase our capital surplus just be permitting these highly liquid ass[ets] to mature without replacement.  So the $3.9 billion of stated [assets], plus 1.6 in capital applied to short-term assets is $5.5 billion, which I view as potential capital.

114.    With respect to future capital raises, Defendant Mudd stated in the February 27, 2008 conference call:

There are no current plans to go back to the market for capital because we have all of those other levers that are turned on, producing capital, ***putting us into an increasingly – into a comfortable position based on where we are in the market right now.***

(Emphasis added)

115.    With respect to the capital raise, Defendant Mudd continued to stress that Fannie Mae approached its capital base conservatively stating:

The additional capital we're raising will bolster our "protect and grow" strategy – it will allow us to maintain a ***strong, conservative balance sheet*** through the housing

correction, pursue growth opportunities to enhance long-term shareholder value, and provide liquidity and stability to the secondary market.

(Emphasis added)

116.    Moshe Orenbuch, an analyst with Credit Suisse in New York noted that while many companies took partial reserves against their deferred tax assets, Fannie Mae "recognized the entire tax asset, which was certainly on the aggressive side."[33]

117.    On May 6, 2008, days before Plaintiff purchased its Preferred T shares, Fannie Mae held its first quarter earnings conference call.  During that call, Defendant Mudd made the following statements:

[I]t will enable us to attack the full range of market opportunities without capital restrictions.

*        *        *

So, taking together, all of those factors mean that *we will have more capital to protect the balance sheet*, to grow the business, and to serve the market.  So, all told, including this prospective capital raise that we're undertaking starting today, we will go into the belly of this cycle with about *$48 billion in core capital which is about $17 billion above our statutory capital level*.

We've said before that *this is the time to be long capital and this plan firmly gets us there*.  We plan to harness the capital we're raising for three goals – *one, to attain a position of unquestioned capital strength*; two, to pursue the best business opportunities we have seen without constricting capital; and three to step out and play a major role in helping the market recover better and sooner and to the benefit of all investors in housing whether they be consumers or originators or realtors or homebuilders or investors of Fannie Mae.

(Emphasis added)

118.    On the May 6, 2008 conference call, Defendant Mudd stated:

Let me now close out on the brief discussion of the capital plan.  Our strategy for working through this period is to protect and grow.  That means protecting the company by building and conserving capital and setting aside the right amount of loss reserves as we continue to work to reduce foreclosures and credit losses.  This

---

[33] Bloomberg, *Fannie Mae to Reduce Value of Deferred Tax Assets*, October 29, 2008.

strategy also means growing our business as we help stabilize the market and perform our mission.

119.     Defendant Mudd also stated in the conference call "we are well above the levels of minimum capital."  However, Fannie Mae noted in its second-quarter results that there were a variety of uncertainties that made estimates for 2009 challenging, including "the ability to recover our deferred-tax assets."  Without recognizing its deferred tax assets, Fannie Mae would not have met its capital requirements much less held sufficient capital to withstand a severe crisis.

120.     The statements regarding Fannie Mae's capital base were materially false and misleading because the capital reported was grossly inflated.  Fannie Mae continuously included the full value of deferred tax assets without any write-down reflecting the likelihood that they would never be useable as an offset to any earnings.

121.     On March 19, 2008, the OFHEO announced that it was loosening capital requirements on Fannie Mae.[34]  Fannie Mae's capital surplus requirement would be reduced from 30 percent to 20 percent – in other words, Fannie Mae was allowed to reduce its capital on hand to cover its losses.[35]

122.     On May 6, 2008, Fannie Mae reported in its first quarter 10-Q a $2.2 billion quarterly loss, as well as a dividend cut.  Fannie Mae also announced it would raise $6 billion in new funds.  However, Fannie Mae downplayed its exposure to losses and lack of adequate capitalization and sought to dispel concerns pertaining to its financial health.

123.     On June 25, 2008, Fannie Mae reported a two-fold increase in mortgage delinquency rates over the prior year period, but added, "We're managing our portfolio in a safe

---

[34] Robert Schroeder, *OFHEO loosens capital rules on Fannie Mae*, Wall Street J.com (March 19, 2008).
[35] *Id.*

and sound manner."[36]  Despite Fannie Mae's representations regarding its management of its portfolio and capital reserves, in truth, the company was severely undercapitalized.

124.     Fannie Mae continued to mislead the public when it said its regulatory capital stood at $47 billion as of June 30, 2008; $14.3 billion above its statutory minimum capital requirement and $9.4 billion above its 15 percent surplus requirement. Over $20 billion of that regulatory capital, approximately 43%, consisted of deferred-tax assets, up from $13 billion at the end of 2007.

125.     On October 9, 2008, the FHFA  published a news release stating that:

> Director *Lockhart is classifying Fannie Mae and Freddie Mac as of June 30,* *2008, prior to the conservatorship, as undercapitalized* using FHFA's discretionary authority provided in the statute.  Both Fannie Mae and Freddie Mac have publicly released financial results for the second quarter of 2008.  Although both Enterprises' capital calculations for June 30, 2008, reflect that they met the FHFA and statutory requirements for capital, the continued market downturn during late July and August raised significant questions about the sufficiency of capital.  The following factors, which led to the need for conservatorship, support the Director's decision to downgrade the classification to undercapitalized:
>
> • Accelerating safety and soundness weaknesses, especially with regard to credit risk, earnings outlook, and capitalization;
> • Continued and substantial deterioration in equity, debt, and MBS market conditions;
> • The current and projected financial performance and condition of each company as reflected in its second quarter financial reports and our ongoing examinations;
> • The inability of the companies to raise capital or to issue debt according to normal practices and prices;
> • The critical importance of each company in supporting the country's residential mortgage market; and
> • Concerns that a growing proportion of their respective statutory core capital consisted of intangible assets.

(Emphasis added)

This press release confirms that all prior statements by all named Defendants concerning capitalization were false.

---

[36]David S. Hizenrth, *Delinquencies Rise at Fannie Mae, Freddie Mac*, Washington Post (June 26, 2008), at D1.

126.     Despite Fannie Mae's financial position, the company continued to release positive statements with regard to its capital base stating that it not only had sufficient capital, but a **strong** capital base.  In a statement on Fannie Mae's capital adequacy released by Chuck Greener,  Fannie Mae Senior Vice President, on  July 11, 2008:

> Fannie Mae raised $7.4 billion of additional capital in May, for a total of more then $14 billion in new capital in November of 2007.  ***Our capital level is substantially above both our statutory minimum capital and the OFHEO-required 15 percent surplus over minimum capital***.  ***In fact, we have more core capital, and a higher surplus over our regulatory requirement, that at any time in the company's history.***

> As we work through this tough housing market, ***we are maintaining a strong capital base, building reserves for our credit losses***, and generating solid revenues as our business continues to serve the market.  We also have access to ample sources of liquidity, including access to the debt markets.  The company issues more than $24 billion in debt alone, including a $3 billion Benchmark Notes sale that was oversubscribed.  In short, Fannie Mae remains well-equipped to fulfill our critical role in the housing financing system, today and in the future.

> (Emphasis added)

127.     As the housing market declined, Fannie Mae continued to reassure investors that it had sufficient capital to withstand the downturn even with its substantial exposure to the market.  Fannie Mae continued to conceal that it did not have adequate capital to overcome the market conditions.

### 5.    The Reality of Fannie Mae's Financial Position

128.    On July 9, 2008, in a *Bloomberg* report, Friedman, Billings, Ramsey & Co. analyst Paul Miller observed, "Fannie and Freddie are going to have to raise more capital and nobody thinks they're going to be able to raise capital when they need to.  It's going to be very expensive."

129.    On July 10, 2008, shortly after Plaintiff purchased Preferred Series T Shares, former St. Louis Federal Reserve Board President William Poole stated in an interview that Fannie Mae was technically insolvent.[37]

130.    On July 11, 2008, *The New York Times* published an article titled "U.S. Weighs Takeover of Two Mortgage Giants," indicating that the federal government was considering a plan to take over Fannie Mae and place it into a conservatorship.[38]

131.    On July 30, 2008, President Bush signed a housing rescue bill which included a Fannie Mae bailout.[39]  Specifically, it provided Fannie Mae with an unlimited line of credit with the United States Treasury (increased from $2.25 billion) and authorized the Treasury to purchase shares in Fannie Mae, if necessary.[40]  However, even this measure proved to be insufficient.

132.    On September 2, 2008, Fitch Ratings lowered its rating on Fannie Mae preferred stock to just one level above junk status, citing: (a) Fannie Mae's lack of capitalization due to its lack of reliable access equity markets; and (b) Fannie Mae's $307 billion in Alt-A mortgages.[41]

---

[37] *Id*.
[38] Stephen Labaton and Steven R. Weisman, *U.S. Weighs Takeover of Two Mortgage Giants*, NYTimes.com (July 11, 2008).
[39] *See* Jeanne Sahadi, *Bush Signs Housing Rescue Law*, CNNMoney.com (July 30, 2008)
[40] *Id*.
[41] Jeff Clabaugh, *Fannie Mae, Freddie Mac Preferred Stock Cut at Fitch*, Washington Business Journal (September 2, 2008).

133.    On September 7, 2008, the government placed Fannie Mae into conservatorship.

134.    That same day, *Market Watch* published a report "Washington takes over Fannie Mae, Freddie Mac" which stated, "Henry Paulson told reporters that a careful review of the two mortgage giant's books made it 'necessary to take action.'"

135.    The report went on to state:

There were reports that auditors called in by the Treasury and FHFA had found accounting irregularities at the two firms and that their capital base was smaller than expected.

*          *          *

At first, Paulson had talked in terms of an equity investment in the two firms.  But after review, a full-scale takeover of the two firms was seen as the only option.

136.    Furthermore, a *Bloomberg* article published on September 9, 2008, entitled, "Fannie Mae, Freddie 'House of Cards' Prompts Takeover" reported:

Once they got someone looking closely at Fannie and Freddie's books, they realized there just wasn't adequate capital there," U.S. Senator Richard Shelby of Alabama, the ranking Republican on the Senate Banking Committee, said after a briefing by Treasure officials.  "They found out they had a house of cards."

*          *          *

Fannie and Freddie's accounting during the housing crisis appears to have been more fantasy than reality," said Rosner, who first highlighted problems in 2003, before the two companies were forced to restate about $11.3 billion in earnings.

*          *          *

After looking through the finances, Fed examiners deemed their capital reserves too low, Dallas Fed[eral Reserve] President Richard Fisher said yesterday.

We concluded that the capital of these institutions was too low relative to their exposure," Fisher said in response to an audience question after a speech in Austin, Texas.  Further, **"*that capital in and of itself was of low quality*."**

(Emphasis added)

137.     James Lockhart, director of the OFHEO stated that much of Fannie Mae's assets were based on intangible assets that did not amount to actual cash that could be used in a crisis.[42]

138.     Examiners from the Federal Reserve, who helped review Fannie Mae's books, found that in addition to thin and low quality capital, the company may have been understating their losses, according to Dallas Federal Reserve President, Richard Fisher.[43]

139.     On September 9, 2008, Standard & Poor's announced that, following the close of trading on September 10, 2008, it would remove Fannie Mae from the S&P 500, citing the fact that the company's capitalization had fallen well below the $5 billion required to list among the S&P 500.[44]

140.     After Plaintiff invested $15 million in Fannie Mae, the truth about the company's capital base was revealed.  Although Fannie Mae represented that its capital was being managed conservatively and that the company had sufficient capital to weather a market more adverse than expected, the reality was that Fannie Mae reported deferred tax assets that would likely not be realized in future quarters, retained capital at a level over 20 percent less than requirements for most financial institutions and was more heavily invested in the failing market than other financial institutions.

---

[42] Fannie Mae to Reduce Value of Deferred Assets (update 2), *Bloomberg*, October 29, 2008.
[43] *Id.*
[44] Press Release, Standard & Poor's, *Standard & Poor's Announces Changes to U. S. Indices*, September 9, 2008.

**F.      Risk Management**

141.      Fannie Mae reported in its quarterly SEC filings that it was observing and managing the risk to which it was exposed.  However, officers of Fannie Mae made a conscious decision to invest in risky loans and ignored warnings that its actions were too risky to continue.

**1.      Fannie Mae's Risk**

142.      Fannie Mae joined its competitors in the risky real estate market investing in subprime and Alt-A loans.

143.      On December 9, 2008, House of Representatives Committee on Oversight and Government Reform held a hearing regarding the takeover of Fannie Mae and Freddie Mac revealing Fannie Mae's entry and involvement in risky loans.

144.      Among documents produced to the Oversight Committee from Fannie Mae was a confidential presentation from June 27, 2005, which stated:  "We face two stark choices:  (1) Stay the course; or (2) Meet the market where the market is."  "Stay the course" meant focusing predominantly on more secure, prime and fixed-rate mortgages.  The presentation explained that this option would "maintain our strong credit discipline" and "protect the quality of our book."

145.      But according to the confidential presentation, the real "revenue opportunity" was in buying subprime and other alternative mortgages.  To pursue this course, the company would have to "accept higher risk and higher volatility of earnings."   This presentation recognized that homes were "being utilized … like an ATM."  It acknowledged that investing in subprime and alternative mortgages would mean "higher credit losses" and "increased

exposure to unknown risks."  Fannie Mae did not want to be left behind as its competitors sought higher potential earnings and instead strived to be a market leader.

146.    The documents produced to the Oversight Committee make clear that Fannie Mae knew the risk involved in the subprime meltdown.  Their own risk managers raised warning after warning about the dangers of investing heavily in the subprime and alternative mortgage market.

147.    On November 10, 2005, a top Fannie Mae official warned, "Our conclusion has consistently been that lowering of risk in many of these private-label securities has not adequately been reflected in their pricing."

148.    On October 28, 2006, Fannie's Chief Risk Officer, Enrico Dallavecchia, sent an email to Defendant Mudd, CEO, warning about a serious problem.  He informed Defendant Mudd, "There is a pattern emerging of inadequate regard for the control process."

149.    On July 16, 2007, he sent another email to Defendant Mudd complaining that the Board of Directors had been told falsely that "we have the will and the money to change our culture and support taking more credit risk."  Dallavecchia wrote:

> I have been saying that we are not even close to having proper control processes for credit market and operational risk.  I got a 60 percent budget cut.  Do I look stupid?

150.    As the real estate market became a risky investment, Fannie Mae was a lead investor, but downplayed its risks assuring it's investors that its risk was being controlled. However, emails and presentations from within the company demonstrated that the Officer Defendants knew these assurances were false.

151.    Even though Fannie Mae's risk officers recognized that the company was not adequately managing its risk and warned the executives of potential problems, Fannie Mae

specifically reported in the Risk Management section of its SEC filings each year that it was properly managing risks.

### 2. Fannie Mae's Representations Regarding Risk Controls

152.    On December 6, 2006, Fannie Mae filed its 10-K for 2004[45] signed by, among others, Defendant Ashley and Defendant Mudd.  With regard to risk management, the annual filing stated:

> Effective management of risks is an integral part of our business and critical to our safety and soundness. In the following sections, we provide an overview of our corporate risk governance structure and risk management processes, which are intended to identify, measure, monitor and control the principal risks we assume in conducting our business activities in accordance with defined policies and procedures. Following the overview, we provide additional information on how we manage each of our four major categories of risk. In "Item 1A—Risk Factors," we identify other risk factors that may adversely affect our business.

> **Risk Governance Structure**

> We made significant organizational changes in 2005 and 2006 to enhance our risk governance structure and strengthen our internal controls due to identified material weaknesses. During 2005, we adopted an enhanced corporate risk framework to address weaknesses in our risk governance structure. This new framework is intended to ensure that people and processes are organized in a way that promotes a cross-functional approach to risk management and controls are in place to better manage our risks. Basic tenets of our corporate risk framework include establishing corporate-wide policies for risk management, delegating to business units primary responsibility for the management of the day-to-day risks inherent in the activities of the business unit, and monitoring aggregate risks and compliance with risk policies at a corporate level.

> **Risk Policy and Capital Committee of the Board of Directors**

> The Board of Directors is responsible for approving our risk governance framework and providing capital and risk management oversight. The Board exercises its oversight of credit risk, market risk, operational risk and liquidity risk primarily through the Board's Risk Policy and Capital Committee. The responsibilities of the Risk Policy and Capital Committee include:

---

[45] Fannie Mae did not file timely financial results beginning in July 2004, when federal regulators ordered the company to restate its finances.  Fannie Mae resumed timely filings on November 9, 2007.

- recommending for Board approval enterprise risk governance policy and limits consistent with our mission, safety and soundness;

- overseeing the development of policies and procedures designed to: (i) define, measure, identify and report on credit, market, liquidity and operational risk; and (ii) establish and communicate risk management controls throughout the company;

- overseeing compliance with all enterprise-wide risk management policies;

- overseeing the Chief Risk Office; and

- reviewing the sufficiency of personnel, systems and other risk management capabilities.

In 2006, the Board of Directors adopted corporate risk principles that are being implemented to govern our risk activities. These principles include taking risks in an informed and disciplined manner and ensuring that we are adequately compensated for the risks we take, consistent with our mission goals.

153.    On May 2, 2007, Fannie Mae filed its 10-K for 2005 signed by, among others, Defendants Ashley and Mudd.  Fannie Mae's filing included statements substantially similar to the statements in its 2004 10-K set forth above. In addition, Fannie Mae's 2005 10-K stated:

At the end of 2006, we restructured our risk management committees to enhance our risk governance framework. We dissolved the Corporate Risk Management Committee, which had previously focused on both credit and market risk oversight, and formed two separate committees, the Credit Risk Committee and the Market Risk Committee. We now have three management-level risk committees that focus on our major categories of risk: (i) the Credit Risk Committee, which focuses on credit risk; (ii) the Market Risk Committee, which focuses on market, liquidity and model risk; and (iii) the Operational Risk Committee, which focuses on operational risk.  Each committee is responsible for, among other things:

- monitoring aggregated risk exposure;

- discussing emerging risk issues;

- reviewing key corporate risk limits and exposures;

- reviewing the risk aspects of significant new business initiatives; and

- reviewing and recommending risk policies with corporate-wide or significant business unit implications.

We also established two additional management-level risk committees that focus on other significant business risks: (i) the Capital Structure Committee, which focuses on capital management activities; and (ii) the Compliance Coordination Committee, which focuses on compliance with legal and regulatory requirements. Our Compliance Coordination Committee also is responsible for coordinating the legal and regulatory compliance risk governance functions with other control functions, such as Legal, Internal Audit and the Chief Risk Office.

The Management Executive Committee, which is chaired by the Chief Executive Officer and composed of principal executive officers of the company, has responsibility for reviewing and approving our enterprise-wide risk tolerance policy and our enterprise-wide risk framework, addressing issues referred to it by our risk committees, addressing matters that involve multiple types of risks and addressing other significant business and reputational risks. Where appropriate, the Management Executive Committee brings transactions of an extraordinary nature and significant potential new business activities to the Risk Policy and Capital Committee of the Board of Directors, as well as other relevant committees if necessary, for review and approval.

154.    On August 16, 2007, Fannie Mae filed its annual 10-K for 2006.  The 2006 10-K was signed by, among others, Defendants Ashley and Mudd.  With respect to risk management, the annual 10-K filing stated:

Effective management of risks is an integral part of our business and critical to our safety and soundness.

*         *         *

Our corporate risk framework is intended to ensure that people and processes are organized in a way that promotes a cross-functional approach to risk management and that controls are in place to better manage our risks.  Basic tenets of our corporate risk framework include:

- Establishing corporate-wide policies for risk management,

41

- Delegating to business units primary responsibility for the management of day-to-day risks inherent in the activities of the business unit,
- Enacting policies and procedures designed to ensure that we have an independent risk oversight function with appropriate checks and balances throughout our company; and
- Monitoring aggregate risks and compliance with risk policies at a corporate level.

63.    Fannie Mae filed its 2007 10-K on February 27, 2008 which was signed by, among others, Defendants Ashley, Mudd, and Swad.  With respect to risk management Fannie Mae's filing stated:

> Our risk governance framework, which is approved by our Board of Directors, is designed to balance strong corporate oversight with well-defined independent risk management functions within each business unit. The objective of our corporate risk framework is to ensure that people and processes are organized in a way that promotes a cross-functional approach to risk management and that controls are in place to better manage our risks and comply with legal and regulatory requirements.

> Senior managers of each business unit are responsible and accountable for identifying, measuring and managing key risks within their business consistent with corporate policies. Management-level credit, market, liquidity and operational risk committees provide oversight of the business units and are responsible for establishing risk tolerance policies, monitoring performance against our risk management strategies and risk limits, and identifying and assessing potential issues. We also have a Chief Risk Office that is responsible for establishing our overall risk governance structure and providing independent evaluation and oversight of our risk management activities. Our Board of Directors, through the Risk Policy and Capital Committee, provides additional risk management oversight.

> Our Internal Audit group provides an objective assessment of the design and execution of our internal control system, including our management systems, our risk governance, and our policies and procedures. Our Office of Compliance and Ethics is responsible for overseeing our compliance activities and coordinating our OFHEO and HUD regulatory reporting and examinations; and managing our data privacy and anti-fraud efforts.

155.    On a conference call on February 27, 2008, Defendant Mudd stated, "First, we are taking steps to protect our business from the risks that are apparent in this extraordinary

market." He also stated with respect to the company's risk, "On credit, we're taking additional steps to protect the book by controlling our risk and our losses."

156.    Although Fannie Mae continued to reassure investors that the company's risk was being monitored, in fact Fannie Mae ignored warnings of risks during a failing market when it was more heavily invested in financial institutions in investing in subprime and Alt-A mortgages.  Even when other institutions were leaving the subprime and Alt-A market, Fannie Mae continued to invest in risky loans.

**G.    Fannie Mae's Preferred Series T**

157.    On May 19, 2008, Fannie Mae issued the Offering Circular for its 8.25% Non-Cumulative Preferred Stock, Series T for $25 per share.  The stock was offered as a Preferred Stock and was to be listed on the New York Stock Exchange under the symbol "FNMprT."[46] According to the Offering Circular, Fannie Mae would issue 80,000,000 shares of the new stock and intended to raise $2 billion.  Defendants Merrill Lynch, CGMI, Morgan Stanley, UBS, and Wachovia were the underwriters.  The Offering Circular for the Preferred Stock was drafted and reviewed by the Officer Defendants and the Underwriter Defendants and listed the names of the Underwriter Defendants on the cover.  On May 13, 2008, Plaintiff, through its agent, American National Insurance Company, purchased 600,000 shares of the Preferred Series T shares, CUSIP 313586737 pursuant to this Offering Circular for a total of $15 million.

158.    The Offering Circular summarized, and incorporated by reference, Fannie Mae's most recent 10K and 10Q filings including its statement concerning the company's capitalization. With regard to the company's risk factors, the Offering Circular repeated Fannie Mae's previous statements concerning its $17.8 billion in deferred tax assets, which was still

---

[46] The Preferred Series T was never listed on the New York Stock Exchange as represented in the Offering Circular.

being carried at full value. It reassured investors that under current conditions it was appropriate to carry this asset at fair value:

> We must evaluate our ability to realize the tax benefits associated with our deferred tax assets quarterly. In the future, we may be required to record a material expense to establish a valuation allowance against our deferred tax assets, which like would materially adversely affect our earnings, financial condition and capital position.

159.    The Offering Circular, represented that Fannie Mae's core capital as of March 31, 2008 was $42.7 billion. Fannie Mae alleged that its core capital exceeded the statutory minimum capital requirement by $11.3 billion, and exceeded the statutory minimum capital requirement plus the 20% OFHEO-directed capital surplus requirement by $5.1 billion.

160.    The Offering Circular stated that "to ensure compliance with each of our regulatory capital requirements, we maintain different levels of capital surplus for each capital requirement." It went on to state that "as a consequence, we generally seek to maintain a larger surplus over the risk-based capital requirement to ensure continued compliance" and "we target a surplus above the statutory minimum capital requirement and OFHEO-directed minimum capital requirement to accommodate a wide range of possible valuation changes that might adversely impact our core capital base."

161.    These statements were materially false and misleading when made as described more fully above. The representations concerning the Fannie Mae's core capital and total capital were grossly inflated. A substantial part of Fannie Mae's assets were the full face value of deferred tax assets without any write-down reflecting the near certainty that they would never be useable as an offset to any earnings.

162.    In addition to including deferred tax assets in Fannie Mae's core capital, the Offering Circular reported an inadequate write-down of sub-prime and Alt-A loans. By the end of 2007, Fannie Mae was holding about $74 billion in Alt-A and subprime loans in its portfolio,

but had written them down by only $4.6 billion. Fannie Mae recorded only an additional $714 million charge as a permanent write-down despite the fact that a good portion of Fannie Mae's portfolio was severely delinquent.

## IV. SCIENTER

163.    Because of their position, the Officer Defendants knew, or consciously disregarded, were reckless and grossly negligent in not knowing, and should have known, adverse non-public information about Fannie Mae. Throughout the relevant period, the Officer Defendants participated in the issuance of false and misleading statements concerning the operations of Fannie Mae, including misleading press releases, and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts, and Fannie Mae shareholders.

164.    In addition to all scienter allegations pled in this complaint, Plaintiff further pleads that Defendants Mudd, Levin, Swad and Ashley (the "Officer Defendants") acted with scienter in intentionally misrepresenting facts to the public and omitting material information from their SEC filings and conference calls.

165.    These Officer Defendants were the highest ranking officers at Fannie Mae. Defendant Mudd was Fannie Mae's President and CEO from June 2005 to September 7, 2008; Vice Chairman of the Board from February 2000 to June 2005; Interim CEO from December 2004 to June 2005; and Chief Operating Officer ("COO") from February 2000 to December 2004. Defendant Levin was Fannie Mae's Executive Vice President and Chief Business Officer from November 2005 to September 7, 2008; Interim Chief Financial Officer ("CFO") from December 2004 to January 2006; Executive Vice President of Housing and Community Development from June 1998 to December 2004; and Executive Vice President-Marketing

from June 1990 to June 1998.  Defendant Swad was Fannie Mae's Executive Vice President from May 2007 to September 7, 2008 and was CFO from August 2007 to September 7, 2008. Defendant Ashley was Fannie Mae's Chairman of the Board from December 2004 to September 2008; Director from May 1995 until September 2008; and was a member of Fannie Mae's Housing and Community Finance Committee and Risk Policy and Capital Committee since 2007.

166.    The Officer Defendants' positions within Fannie Mae made them aware of the circumstances surrounding Fannie Mae's business practices and financial position.  Each of the Officer Defendants made representations or failed to disclose information regarding Fannie Mae's Alt-A and subprime exposure as well as its financial stability with regard to its capital base and risk management practices through reports and public press conferences.

167.    Fannie Mae's executives took only minimal write-downs, failed to properly account Fannie Mae's guaranty obligations, mis-categorized tax deferred assets as part of its capital base and made deceptive statements to the public and Fannie Mae's investors that the company had excess capital and superior risk management practices.

168.    Defendants Mudd, Levin, Swad and Ashley signed 10-Qs and/or 10-Ks attesting to their responsibility for and knowledge of disclosure controls and procedures, as defined in Exchange Act rules 13a-15(e) and 15d-15(E), as well as Fannie Mae's internal control over financial reporting.

169.    Emails to Defendant Mudd and the signatures of all Officer Defendants on the 10-Qs and/or 10-Ks acknowledging a series of losses, which indicated compliance with the GAAP requirement not to utilize tax deferred assets, evidence each Officer Defendant's knowledge of Fannie Mae's exposure to the failing market and its lack of sufficient capital.

However, the Officer Defendants continually reassured the public affirmatively stating that Fannie Mae had sufficient capital and was in a position to, not just overcome, but to in fact profit during the rough economic circumstances surrounding the real estate and mortgage markets.

170.     The real estate and mortgage markets began a tremendous downturn.   The mortgage market began to experience a surge in mortgage loan defaults because of the proliferation of high-risk mortgage loans.   Throughout this increasing decline in the mortgage market, Fannie Mae and the Officer Defendants continued to state they were conservatively managing their capital, were employing risk management controls and were in excess of the minimum requirements for capital.

171.     However, despite seeing the warning signs and knowing about the unfavorable market conditions, the Officer Defendants steadfastly refused to disclose the inadequacy of Fannie Mae's capital base as hidden by the improper inclusion in the capital base of tax deferred assets.

**A.     Defendant Mudd**

172.     Defendant Mudd repeatedly misled investors by painting an improper picture of Fannie Mae's financial condition in the company's 10-Ks and 10-Qs and in repeated statements in conference calls.    He knew that the filings and statements contained material misrepresentations regarding Fannie Mae's risk controls, asset valuation, risk exposure to the non-prime mortgage market and its capital and liquidity all of which impacted Fannie Mae's reported capital base and earnings.

173.     These material misrepresentations were intentionally made.  For example, mere months before Fannie Mae's conservatorship, when Defendant Mudd was well aware of Fannie

Mae's lack of capital, Defendant Mudd stated that Fannie Mae "is in solid shape to support the market, and is in better shape to benefit when the market correction ends."[47]

174.    Defendant Mudd assured investors that Fannie Mae was well above both the statutory and OFHEO minimum requirements for core capital and stated that Fannie Mae continued to manage its capital account "very conservatively."  Yet within a few short months after making these statements, Fannie Mae finally acknowledged in its second quarter results for 2008 that it might be challenging to "recover our deferred-tax assets."  Defendant Mudd was aware that Fannie Mae had suffered a series of quarterly losses and would most likely not realize the deferred tax assets that comprised a substantial portion of Fannie Mae's reported capital.

175.    Soon after the government placed Fannie Mae under conservatorship, Fannie Mae wrote down over $20 billion in deferred assets.

## B.    Defendant Levin

176.    Defendant Levin misled investors in his portrayal of Fannie Mae's financial condition in the company's 10-Ks and 10-Qs and in public statements.  He knew that the filings and statements contained material misrepresentations regarding Fannie Mae's risk controls, asset valuation, risk exposure to the non-prime mortgage market and its capital and liquidity all of which impacted Fannie Mae's reported capital base and earnings.

177.    The misrepresentations made by Defendant Levin were intentional. In a February 27, 2008 conference call, Defendant Levin, despite knowing of the problems in the non-prime mortgage market and Fannie Mae's inadequate risk management and insufficient capital base, told investors that the company was managing its capital conservatively.  He

---

[47] *Fannie Mae Files 2007 Quarterly Reports with the SEC – Company Returns to Current Financial Reporting*, Press Release from Fannie Mae, November 9, 2007.

further stated in that same conference call that "[o]ur operating philosophy for capital is to manage it to protect ourselves against market scenarios more adverse than we expect."

178.    However, Defendant Levin was aware that Fannie Mae's capital base consisted in large part of intangible assets that could not be used in a period of crisis.

179.    As Executive Vice President and Chief Business Officer, Defendant Levin was aware of the misrepresentations made in SEC filings and by various Fannie Mae officers and directors but did nothing to correct those misrepresentations or filings.

## C.    Defendant Swad

180.    Defendant Swad misled investors in his portrayal of Fannie Mae's financial condition in the company's 10-Ks and 10-Qs and in public statements.  He knew that the filings and statements contained material misrepresentations regarding Fannie Mae's risk controls, asset valuation, risk exposure to the non-prime mortgage market and its capital and liquidity all of which impacted Fannie Mae's reported capital base and earnings.

181.    The misrepresentations made by Defendant Swad were intentional. In a November 9, 2007 conference call, Defendant Swad, despite knowing of the problems in the non-prime mortgage market and Fannie Mae's inadequate risk management and insufficient capital base, told investors that Fannie Mae's capital was in excess of its requirements and that Fannie Mae believed "we can make investments and earn returns well above our cost of capital."  Again, a few months later, in a February 27, 2008 conference call Defendant Swad again reiterated to investors that Fannie Mae well in excess of its capital requirements. Contrary to Defendant Swad's representations, he was aware that Fannie Mae had included billions in deferred assets in its capital base which, if not reported, would have placed the company well below its minimum capital requirements.

182.    As Executive Vice President and CFO, Defendant Swad was primarily responsible for managing Fannie Mae's financial risks as well as being responsible for financial planning, financial record-keeping, and financial reporting for Fannie Mae and was aware of the misrepresentations made in SEC filings and by various Fannie Mae officers and directors but did nothing to correct those misrepresentations or filings.

**D.    Defendant Ashley**

183.    Defendant Ashley misled investors in his portrayal of Fannie Mae's financial condition in the company's 10-Ks and 10-Qs and in public statements.  He knew that the filings and statements contained material misrepresentations regarding Fannie Mae's risk controls, asset valuation, risk exposure to the non-prime mortgage market and its capital and liquidity all of which impacted Fannie Mae's reported capital base and earnings.

184.    As Chairman of the Board, Defendant Ashley was aware of the misrepresentations made in SEC filings and by various Fannie Mae officers and directors but did nothing to correct those misrepresentations or filings.

## V. **LOSS CAUSATION**

185.    The price of Fannie Mae's securities was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  As set forth above, when the true facts became known by the market and investors and the materialization of the risks that had been fraudulently concealed by Defendants occurred, the price of these securities declined precipitously as the artificial inflation was removed from the price of these securities, causing damage to Plaintiff.

186.     Moreover, the adverse consequences of the disclosures and nondisclosures were foreseeable to Defendants at all relevant times.   Defendants' conduct, as alleged in this complaint, proximately caused foreseeable losses and damages to Plaintiff.

## VI.  CAUSES OF ACTION

187.     Plaintiff hereby incorporates by reference all the proceeding paragraphs into each of the causes of action and requests for relief listed below and herein.

### A.     Violation of Section 10(b) of the Exchange Act

188.     Plaintiff brings this cause of action against the Officer Defendants for violations of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

189.     As explained above, the Officer Defendants are liable for making false and misleading statements, or failing to disclose material adverse facts and acting directly as a participant in a scheme and/or course of business which: (i) deceived the investing public, including Plaintiff, regarding Fannie Mae, its business, products, and prospects; (ii) artificially inflated the market price of Fannie Mae securities; and (iii) caused Plaintiff to purchase Fannie Mae securities at inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, each of the Officer Defendants, took the actions set forth previously in this complaint.

190.     Each Officer Defendant's direct participation includes the presentation and/or review of Fannie Mae's false and/or misleading SEC filings, registration statements, Preferred Series T Offering Circular and/or press releases, and giving false information to securities analysts, money and portfolio managers, and institutional investors in conference calls.

191.     Each Officer Defendant had a duty to disseminate accurate and truthful information promptly with regard to Fannie Mae's operations, financial condition, and performance so that the market prices of Fannie Mae's securities would be based on truthful,

complete and accurate information. Additionally, the Officer Defendants each had a duty to correct any previously issued statements that had become untrue and to disclose any adverse trends known to them that would materially affect Fannie Mae's operating results.  The Officer Defendants' duties are required, in part, by the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X 17 and S-K[48] and other SEC regulations.

192.    Each  Officer Defendant, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as pled with specificity in this complaint in the way that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading; or (c) engaged in acts, practices and a course of business which operated as a fraud or deceit upon Plaintiff in connection with their purchases of Fannie Mae securities.

193.    Despite their knowledge of Fannie Mae's false and misleading statements, each Officer Defendant failed to disclose material adverse facts about the financial condition and business prospects of Fannie Mae, which caused the SEC filings, registration statements, offering circulars, press releases and other public statements to be materially false and misleading for the reasons particularized previously.  Each Officer Defendant, directly and indirectly, knowingly engaged and participated in a fraudulent scheme and course of conduct to conceal adverse material information about the business, finances, financial condition, and future business prospects of Fannie Mae.

194.    Each of the Officer Defendant's primary liability (including controlling person liability) arises from the fact that: (i) each Officer Defendant was a high-level executive and/or director of Fannie Mae; (ii) each Officer Defendant, by virtue of his responsibilities and

---

[48] 17 C.F.R. § 210.01 *et. seq.* and 17 C.F.R. 229-10 *et. seq.*, respectively.

activities as a senior executive officer and/or director of Fannie Mae, was privy to, and participated in, the creation, development and reporting of Fannie Mae's internal budgets, plans, projections and/or reports; (iii) each Officer Defendant had familiarity with each other and were advised of and had access to other members of Fannie Mae's management teams, internal reports, and other data and information about Fannie Mae's financial condition and performance at all relevant times; and (iv) each Officer Defendant was aware of Fannie Mae's dissemination of information to the investing public that he knew was materially false and misleading or for which he recklessly disregarded the truth.

195.    Plaintiff, at the time of the misrepresentations and omissions, was ignorant of the falsity of the statements and believed them to be true. In reliance upon these misrepresentations, and upon the integrity of the market, the securities offering process, the fidelity, integrity and superior knowledge of the Officer Defendants, Plaintiff, in ignorance of the true condition of Fannie Mae, was induced to and did purchase Fannie Mae securities.  Had Plaintiff known the truth, it would not have bought its securities or would have bought them at a lower price.

## B.    Violation of Section 20(a) of the Exchange Act

196.    The Officer Defendants violated Section 20(a) of the Exchange Act and are liable to the Plaintiff.  Each Officer Defendant was, and acted as, a controlling person of Fannie Mae within the meaning of Section 20(a) of the Exchange Act.  Each Officer Defendant had direct involvement in the day-to-day operations of Fannie Mae and with respect to the transactions in question and had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Fannie Mae, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.  Each Officer Defendant was provided with or had unlimited access to copies of Fannie Mae's

reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

197.   By reason of such wrongful conduct, each Officer Defendant is liable to Plaintiff pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of Fannie Mae securities.

**C.   Violation of Section 12(a)(2) of the Securities Act**

198.   For purposes of this cause of action, Plaintiff expressly disavows reliance on and does not incorporate any allegations that may be interpreted to sound in fraud or any allegations relating to scienter.

199.   This Count is asserted by Plaintiff against the Underwriter Defendants pursuant to Section 12(a)(2) of the Securities Act.

200.   The Underwriter Defendants offered or sold Fannie Mae Preferred Series T securities pursuant to the Offering Circular.  The Offering Circular contained untrue statements of material fact and omitted other material facts necessary to make the statements not misleading and failed to disclose material facts.

201.   The Underwriter Defendants were sellers or solicitors within the meaning of the Securities Act because they solicited Preferred T securities to Plaintiff motivated, at least in part, by a desire to serve their own financial interests, including but not limited to the commissions on their sales of those securities.  The Underwriter Defendants used means and instrumentalities of interstate commerce and the United States mail.

202.     The Underwriter Defendants owed Plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Offering Circular, to ensure that such statements were true and that there were no omissions of material fact necessary to prevent the statements contained in those offering materials from being misleading.  The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained and incorporated by reference into the Offering Circular at the time of the offering in which they participated were true and without omissions of any material facts and were not misleading.  Therefore, the Underwriter Defendants are liable to Plaintiff.

203.     Plaintiff purchased Fannie Mae Preferred Series T in the offering pursuant to the materially untrue and misleading Offering Circular and did not know or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

204.     Plaintiff hereby offers to tender those Fannie Mae Preferred Series T shares it purchased on the offering and continues to own in return for the full consideration paid, plus interest, for those shares.

205.     Based on the conduct alleged in this Complaint, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  Plaintiff, therefore, has the right to rescind and tender their securities to Underwriter Defendants.

**D.     Violation of §27.01 of the Texas Business and Commerce Code**

206.     This count is brought by Plaintiff against all Officer Defendants and Underwriter Defendants for violations of Section 27.01 of the Texas Business & Commerce Code.  For purposes of this cause of action Plaintiff expressly disavows reliance on and do not incorporate any allegations that may be interpreted to sound in fraud or any allegations relating to scienter.

207.    Plaintiff purchased 600,000 shares of Preferred Series T shares underwritten by the Underwriter Defendants on May 13, 2008.  Plaintiff purchased the Preferred T shares through Wachovia.  The Officer Defendants and Preferred T Underwriter Defendants made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

208.    The misrepresentations were intended to and did (i) deceive Plaintiff about the risks associated with Fannie Mae's capitalization; (ii) artificially inflated and maintained the price of the Preferred T; (iii) cause Plaintiff to purchase the Preferred Series T at artificially inflated prices; and (iv) deprive Plaintiff of the expected return on its investment.

209.    The Offering Circular that described the Preferred Series T was materially false and misleading because it failed to reveal Fannie Mae's significant exposure to the subprime market as a result of Fannie Mae's overstated capital base and inaccurate reporting of tax-deferred assets.

210.    The Officer Defendants and Underwriter Defendants made the misrepresentations and/or omissions with the intent to induce purchasers of the Preferred Series T.

211.    Plaintiff reasonably and justifiably relied on the misrepresentations in deciding to purchase Preferred Series T.

212.    As a direct and proximate result of the Officer Defendants and Underwriter Defendants wrongful conduct, Plaintiff incurred substantial monetary damages.

**E.      Violation of § 27.01(d) of the Texas Business and Commerce Code**

213.     This Count is brought by Plaintiff against the Officer Defendants and Underwriter Defendants.  The Officer Defendants and Underwriter Defendants directly and indirectly materially aided Fannie Mae in the fraudulent sale of the Preferred Series T.  In doing so, the Officer Defendants and Underwriter Defendants had an actual awareness that Fannie Mae made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

214.     The Officer Defendants and Underwriter Defendants knew that Fannie Mae's conduct was false, deceptive and/or unfair and failed to disclose the falsity of the representations to Plaintiff.  Each Defendant made materially false statements and therefore had a duty to disclose the truth.

215.     The Officer Defendants and Underwriter Defendants had knowledge regarding the financial affairs of Fannie Mae but failed to correct its statements to investors prior to the purchase of the Preferred Series T by investors.

216.     Plaintiff reasonably and justifiably relied on the misrepresentations in deciding to purchase the Preferred Series T.

217.     Plaintiff would not have purchased the Preferred Series T securities if the true state of Fannie Mae's financial state was not omitted from the Offering Circular.

218.     Defendants benefited from the Officer Defendants' and Underwriter Defendants' material misrepresentations.

219.     As a direct and proximate result of Officer Defendants and Underwriter Defendants aiding and abetting Fannie Mae's fraud, Plaintiff has suffered damages.

**F.      Common Law Fraud**

220.    Plaintiff brings this cause of action against each Officer Defendant.

221.    As fully described above, each Officer Defendant made false and misleading statements and/or material omissions of fact to Plaintiff in connection with its purchase of Fannie Mae securities.

222.    Each Officer Defendant knew the representations were false at the time they were made.

223.    Such statements of fact were material to Plaintiff in its decision to purchase the Fannie Mae Preferred Series T.

224.    Plaintiff reasonably relied upon the Officer Defendants' materially false and misleading misrepresentations and/or material omissions of fact.

225.    Each Officer Defendant intended that Plaintiff would act on their misrepresentations and purchase Fannie Mae Preferred Series T.

226.    Plaintiff was damaged as a result of each Officer Defendant's materially false and misleading statements and/or material omissions of fact.

**G.      Negligent Misrepresentation**

227.    Plaintiff brings this cause of action against the Officer Defendants.  For purposes of this cause of action, Plaintiff expressly disavows on and does not incorporate any allegations that may be interpreted to imply reckless or intentional conduct or that may be interpreted to sound in fraud or any allegations relating to scienter.

228.    As detailed above, Officer Defendants made false and misleading statements and/or material omissions of fact to Plaintiff in connection with its purchase of Fannie Mae stock.

229.    The Officer Defendants owed Plaintiff the duty to ensure any such statements they made were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

230.    The Officer Defendants made such misrepresentations in SEC filings and in the Offering Circular, and public pronouncements pursuant to which Plaintiff purchased its Fannie Mae stock.

231.    The Officer Defendants had pecuniary interests in Fannie Mae securities.

232.    Such statements of fact were made to Plaintiff with the intent that it would rely on them.

233.    Plaintiff reasonably and justifiably relied upon the Officer Defendants' materially false and misleading misrepresentations and/or material omissions of fact.

234.    The Officer Defendants knew, or in the exercise of reasonable care should have known, that their representations were false.

235.    Plaintiff was damaged as a result of the Officer Defendants' materially false and misleading statements and/or material omissions of fact.

236.    Plaintiff was in the limited class of persons the Officer Defendants knew would rely on their representations.

## VII. <u>PRAYER</u>

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor and against Defendants as follows:

      a.      Actual damages, including all direct, consequential, and special damages;

      b.      All equitable relief to which they may be entitled;

      c.      The rescission of Plaintiff's purchase;

      d.      Pre-judgment interest as provided by law;

e.      Punitive damages as provided by statutory and common law;

f.      Attorneys' fees and legal expenses (including expert fees);

g.      Post-judgment interest; and

h.      Costs of Court;

Plaintiff further prays for general relief and such other and further monetary or equitable

relief to which it may be entitled.  Plaintiff respectfully demands a trial by jury.

Respectfully submitted,

**GREER, HERZ & ADAMS, L.L.P.**


By:_____/s/ Andrew J. Mytelka_____.
          **Andrew J. Mytelka**
          **Attorney-in-Charge**
          S.D. Texas Federal  I.D. No. 11084
          State Bar No. 14767700
          **Joe A.C. Fulcher**
          S.D. Texas Federal I.D. No. 11084
          State Bar No. 07509320
          **Eric J. Kirkpatrick**
          State Bar No. 24031215
          S.D. Texas Federal I.D. No. 500364
          One Moody Plaza, 18th Floor
          Galveston, Texas  77550
          (409) 797-3200 (Telephone)
          (409) 766-6424 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**
**COMPREHENSIVE INVESTMENT**
**SERVICES, INC.**